Filed 10/27/23  P. v. Farias CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ELVIRA GARCIA FARIAS,<br><br>    Defendant and Appellant. | F083894<br><br>(Super. Ct. No. BF162227A)<br><br>**OPINION** |

-ooOoo-

### THE COURT*

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Law Office of BreAnne Ruelas and BreAnne Ruelas for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*      Before Franson, Acting P. J., Peña, J. and Snauffer, J.

Defendant Elvira Garcia Farias was convicted by a jury of first degree murder and assault on a child under the age of eight resulting in death, both in connection with the death of her newborn son Baby Farias.[1] On appeal, defendant contends that there was insufficient evidence to support the jury's finding she acted with malice aforethought and committed first degree murder. We affirm.

## PROCEDURAL BACKGROUND

On March 30, 2016, the Kern County District Attorney filed an information charging defendant with willful, deliberate, and premeditated murder with malice aforethought of Baby Farias (Pen. Code, §§ 187, subd. (a), 189; count 1);[2] and assault on a child under the age of eight resulting in death (§ 273ab, subd. (a); count 2).

On December 8, 2021, a jury was empaneled. On December 16, 2021, the jury found defendant guilty on both counts.

On February 1, 2022, the trial court sentenced defendant to a total term of 25 years to life on count 1. The court also sentenced defendant to 25 years to life on count 2 but stayed the sentence pursuant to section 654.

On February 3, 2022, defendant timely appealed.

## FACTUAL BACKGROUND

*Events from November 10, 2014, to June 18, 2015*

As relevant to this case, from November 2014 to June 2015, defendant was pregnant and homeless. Defendant also had a diagnosed mental health condition and was monitored by Skokiaan Rocha, a behavioral health recovery specialist for Kern County. In her position, Rocha would provide case management services that would link clients

---

[1]    The evidence adduced at trial demonstrates that the baby was killed shortly after birth. There is no evidence that the baby was ever named. For purposes of this appeal, we respectfully refer to the victim as "Baby Farias."

[2]    All further statutory references are to the Penal Code unless otherwise noted.

2.

like defendant to various services, such as therapy, job training, or anything else that a client may need.

On November 10, 2014, defendant's mother, Rosa Garcia, spoke with Rocha. Garcia reported that defendant did not want the baby that defendant was carrying. However, Garcia testified that defendant would say seemingly contrary things about her pregnancy with Baby Farias. Garcia testified that defendant stated that she (defendant) had a tumor and was not pregnant, but other times defendant stated that she was going to get an apartment, live with Baby Farias, and that he would help her move forward with her life.

Rocha testified that on June 17, 2015, she was contacted by Garcia. According to Rocha, Garcia stated that defendant was 36 to 37 weeks pregnant and was making threats to harm her unborn child. Garcia denied contacting Rocha. Nevertheless, Rocha contacted her supervisor, who placed a Welfare and Institutions Code section 5150[3] hold on defendant. Rocha explained to the jury that a "5150 hold" is a commitment for a brief period of time for people who are considered a danger to themselves or others or who are greatly disabled so that they can be psychiatrically assessed. Defendant was assessed and released the following morning on June 18. Defendant was released around 5:30 a.m. and taken to her aunt's house in the city of Shafter.

On June 18, 2015, around 7:30 a.m., defendant was seen crossing a street in Shafter by Angela Salyards. Salyards described defendant as being barefoot, disheveled, obviously pregnant, and apparently homeless.

---

[3] In part, Welfare and Institutions Code section 5150 permits law enforcement officers and designated mental health professionals to take persons considered a danger to themselves or others into custody "for a period of up to 72 hours for assessment, evaluation, and crisis intervention." (Welf. & Inst. Code, § 5150, subd. (a); *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1076, fn. 10.)

3.

*Events of June 19, 2015*

Around 7:30 a.m. on June 19, 2015, Salyards again saw defendant. Defendant came out of an alley and walked in front of Salyards's car. Defendant was wearing the same clothing as the day before and still appeared to be pregnant. Defendant was also "[d]ripping wet" from the waist down, but no blood was visible. Defendant walked past Salyards and went in the direction of a nearby park.

Between 8:00 a.m. and 8:15 a.m., Dr. John Moon and nurse Evelyn Stokes arrived at the Rural Health Clinic in Shafter. Moon and Stokes parked in the back of the clinic and saw that a water spigot on the side of the clinic was dripping. Members of the homeless population were known to use the faucet to get water. Moon and Stokes then observed water on the ground and noticed blood near the edge of some bushes. Upon closer inspection, Stokes saw a substantial amount of blood and a placenta on the ground, and blood and a handprint on the corner of the clinic wall. Stokes went inside the clinic and called the police. When she came back out, Moon had retrieved a hose and was starting to wash and spray the blood away. Stokes stopped Moon and told him that he needed to wait for the police.

Just before 9:00 a.m., Shafter Police Officer Alecio Mora arrived at the Rural Health Clinic. Stokes informed Mora of the blood that was discovered, but when Mora went to look, the area was wet, and the blood had been washed away. It does not appear that Mora was informed about the placenta, and, after seeing that the blood was washed away, he concluded the call and continued with his patrol shift.

Around noon, Salyards thought that defendant was homeless and might be hungry and decided to buy defendant lunch. At about 12:20 p.m., Salyards found defendant at a nearby park. Defendant was wearing different clothing than when Salyards saw her earlier in the morning. Defendant was asleep on her side and no longer appeared pregnant. Blood was visible through defendant's shorts around the crotch area and a feminine pad was near defendant. Salyards woke defendant and gave her lunch.

4.

Defendant said, "thank you," appeared to be alert and oriented, did not appear to be in distress, and began eating. It did not occur to Salyards that defendant had given birth, and Salyards left the park without contacting the authorities or medical personnel.

At some point before 2:00 p.m., a niece of Garcia's contacted her and told her that defendant was at the park, no longer had "her belly," and was bleeding profusely. Garcia immediately went to the park and found defendant laying down. Defendant was bleeding from her crotch area and no longer had "her belly." It was obvious to Garcia that defendant had given birth sometime prior. Garcia asked about the baby, but defendant stated that she did not have a baby and that it was a tumor. Garcia called Rocha because she was concerned about defendant and the missing baby. Rocha in turn called 911 and went to the park to look for defendant.

Around 2:00 p.m., fire and ambulance personnel responded to Rocha's call and went to the park. Ambulance personnel did not observe major bleeding from defendant, and defendant was oriented, alert, and gave intelligible responses. Defendant stated that she was having menstrual pain, bleeding, and cramping, and multiple times she denied being pregnant or having given birth. However, ambulance personnel looked in defendant's backpack and saw that there were clothes that had blood on them, and which smelled of amniotic fluid. Defendant eventually consented to allowing the ambulance personnel to take her to the hospital. At the hospital, defendant did not tell the physician that she had given birth, but her condition and hormone levels were consistent with having given birth on June 18 or the morning of June 19.

Rocha and the police also arrived on the scene. Rocha saw that defendant was no longer pregnant and informed the police that there should be a baby. Fire personnel, police personnel, and Rocha then began searching for Baby Farias.

Shafter Police Sergeant Christopher Grider went to the Rural Health Clinic after receiving information from Mora about the call from the clinic earlier in the morning. Grider found a little blood on the ground near a garden hose. Grider also found a bag or

backpack in nearby bushes that contained soiled women's clothing. Grider gave the bag to Mora and continued searching.

At 5:38 p.m., about one block north of the Rural Health Clinic, Grider found the deceased Baby Farias. Behind a building and concealed in some bushes, Grider saw something wrapped in clothing. The bundle was not visible from nearby streets. Grider felt the bundle and unwrapped the clothes enough to identify the infant. Baby Farias was completely wrapped up in two layers of clothes, such that no one would be able to see what was wrapped inside. Baby Farias made no noise and rigor mortis had set in. The umbilical cord stump was still connected. DNA testing from the clothing revealed that defendant and Baby Farias were contributors to a high probability.

*Autopsy of Baby Farias*

An autopsy of Baby Farias was conducted on June 23, 2015, by Dr. Robert Whitmore, a forensic pathologist at the Kern County Coroner's Office. Baby Farias was a newborn who had no congenital anomalies and whose measurements were consistent with a gestational age of 35 to 38 weeks. His stomach contained a small amount of brown mucus, indicating a newborn who had never been fed. Part of an umbilical cord was still attached, and the umbilical cord had been torn, as opposed to being cut with a knife. Baby Farias had air in his lungs, which indicated that he was born alive and likely cried, and his injuries had blood in them, indicating that his heart was beating when the injuries were sustained. There were blunt force injuries such as abrasions, contusions, and lacerations throughout Baby Farias's body, both front and back. While a fall may cause such injuries, Whitmore testified that Baby Farias was beaten. Baby Farias's lips, tongue, and throat were bruised, and the soft palate was lacerated, consistent with fingernails being forced into his mouth. Abrasions and contusions on the back were consistent with fingers squeezing the chest, and six broken ribs were detected. Petechiae, or "pinpoint hemorrhages," in the eyes were consistent with strangulation. Baby Farias also had bruising around the right lower leg, and abrasions to most of the front of his

6.

body, particularly the head and face. The entire face had significant abrasions, including smaller abrasions within larger abrasions. The head was swollen and soft and there were multiple fractures of the cranium, as well as fractures at the base of the skull (which indicated severe head trauma). The dura, the outer tissue between the brain and the skull, was also torn (which indicated extreme force), and the cranium contained a fluid mixture of blood, bone, and brain matter. Whitmore opined the ultimate cause of death was blunt force trauma to the head and the manner of death was homicide. The severe blunt force head trauma could be consistent with a fist or swinging the baby around.

## SUFFICIENCY OF THE EVIDENCE

### A. Parties' Arguments

Defendant argues that there is insufficient evidence to support the convictions. She states the prosecutor relied solely on defendant's prior statements of not wanting to be pregnant anymore to surmise that defendant killed her child. However, there was no showing that defendant caused physical harm to Baby Farias. Further, the prosecution's theory is that within hours of being released from a severe psychiatric hold, defendant deliberated and formed the mental state necessary to murder her child. The prosecutor also wanted the jury to infer that defendant was aware that giving birth outside the hospital would pose a substantial risk and that defendant consciously caused physical harm to her child. These are illogical inferences and do not support a finding of malice and premeditation. Thus, defendant argues, the verdict is based on supposition and insufficient evidence.

The People respond that there is ample evidence that defendant acted with express malice, premeditation, and deliberation. The evidence demonstrated that defendant did not want her child, took steps to hide the body, denied being pregnant, and inflicted multiple severe injuries, which showed that she wanted Baby Farias dead and deliberately acted to meet that goal.

We agree with the People.

7.

### B.  Legal Standards

#### Sufficiency of the Evidence

Appellate courts resolve challenges to the sufficiency of the evidence by reviewing the entire record in the light most favorable to the judgment and determining whether the record contains "evidence which is reasonable, credible, and of solid value" such that a reasonable jury could have found the defendant guilty beyond a reasonable doubt.  (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)  " '[A]fter viewing the evidence in the light most favorable to the prosecution, [we determine whether] *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  (*People v. Morales* (2020) 10 Cal.5th 76, 88 (*Morales*).)  We presume the existence of every fact the jury could reasonably have deduced from the evidence in support of the judgment.  (*People v. Ware* (2022) 14 Cal.5th 151, 167.)  Reasonably deduced or inferred facts are those that logically flow from other facts established in the case.  (*Ware*, at p. 168.)  Reasonable inferences are not those " 'based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.' "  (*Id.*, at p. 167.)  Thus, we " ' accept logical inferences that the jury might have drawn from the circumstantial evidence.' "  (*People v. Flores* (2020) 9 Cal.5th 371, 411.)  So long as the circumstances reasonably justify the jury's findings, reversal will not occur " 'simply because the circumstances might also reasonably be reconciled with a contrary finding.' "  (*Westerfield*, at p. 713.)  That is, just because "a different trier of fact could have concluded otherwise does not mean the verdict is not supported by the evidence."  (*People v. Wilson* (2021) 11 Cal.5th 259, 302.)  Appellate courts neither reweigh the evidence nor reevaluate the credibility of witnesses.  (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)  This standard of review " 'is the same in cases in which the prosecution relies mainly on circumstantial evidence.' "  (*Westerfield*, at p. 713; *People v. Rivera* (2019) 7 Cal.5th 306, 323.)

### *Murder*

"Murder is the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a); *People v. Nelson*, *supra*, 1 Cal.5th at p. 538.) Malice may be express, when the defendant intends to kill the victim, or may be implied, when the defendant performs an act whose natural consequences are dangerous to life and deliberately performs the act with a conscious disregard for life and with knowledge that the life of another will be endangered. (See *In re Ferrell* (2023) 14 Cal.5th 593, 600; *People v. Knoller* (2007) 41 Cal.4th 139, 143, 151.) A murder that is "willful, deliberate, and premeditated" is first degree murder. (§ 189, subd. (a); *Morales*, *supra*, 10 Cal.5th at p. 88.) For purposes of section 189, subdivision (a), " ' " ' "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " ' " (*Morales*, at p. 88.) " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " (*People v. Jurado* (2006) 38 Cal.4th 72, 118; see *Morales*, at p. 88.) Because thoughts can follow each other rapidly, and because cold calculated judgment may be arrived at quickly, " ' "[t]he true test is not the duration of time so much as it is the extent of the reflection." ' " (*Morales*, at p. 88.)

There are three basic categories of evidence, known as the "*Anderson* factors,"[4] that have generally been found sufficient to sustain a finding of premeditation and deliberation: "(1) facts about planning activity 'prior to the actual killing which show[s] that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing'; (2) 'facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim'; and (3) 'facts about the nature of the killing from which the jury could infer that the

---

[4]     *People v. Anderson* (1968) 70 Cal.2d 15.

manner of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design." ' " (*People v. Rivera*, *supra*, 7 Cal.5th at p. 324; see *Morales*, *supra*, 10 Cal.5th at pp. 88–89.)  In short, evidence of planning, motive, and method is generally sufficient to support a finding of premeditation and deliberation.  (*People v. Booker* (2011) 51 Cal.4th 141, 173.)  " ' "When evidence of all three categories is not present, '[the Supreme Court] require[s] either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.' " ' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1253; *People v. Cole* (2004) 33 Cal.4th 1158, 1224.)  Nevertheless, these " 'guidelines are descriptive and neither normative nor exhaustive, and … reviewing courts need not accord them any particular weight.' " (*Rivera*, at p. 324; see *Morales*, at p. 89; see also *Booker*, at p. 173.)

## C.    Analysis

There is no dispute that defendant was pregnant or that she was the mother of Baby Farias.  Although somewhat unclear, we understand defendant to argue that there is insufficient evidence to support three elements of murder:  (1) that she physically harmed Baby Farias; (2) that she acted with malice; and (3) that she acted willfully, deliberately, and with premeditation.  We acknowledge that there is no direct evidence of these elements.  Nevertheless, we conclude that the circumstantial evidence is sufficient to support defendant's conviction.

The jury could have reasonably inferred that defendant harbored ill will toward Baby Farias and thus, had a motive for killing him.  As far back as November 2014, Rocha testified that she had been informed by Garcia that defendant did not want the baby she was carrying.  As recently as June 17, 2015, at most two days before Baby Farias was killed, defendant had made threats against her unborn child.  While Garcia denied informing Rocha of defendant's statements against Baby Farias, the jury was entitled to believe Rocha.  Rocha's testimony could easily be viewed as the more

credible since Rocha explained that it was Garcia's information that caused Rocha to contact her supervisor to start the process of a mental health hold on defendant. Also, although obviously pregnant, defendant denied being pregnant and stated that she had a tumor. Such statements could be viewed as demonstrating disdain toward her unborn child.

Further, the jury could have reasonably inferred that defendant had physically harmed Baby Farias. Defendant was seen pregnant on June 18. On the morning of June 19, defendant was seen with wet pants. Also on the morning of June 19, Stokes and Moon saw blood, a placenta, wet cement, and a dripping faucet outside the Rural Health Clinic. When defendant was seen again asleep at the park around noon, she was no longer pregnant. This evidence indicates that defendant had given birth outside the Rural Health Clinic on the morning of June 19 sometime before 8:30 a.m. When medical personnel arrived at the park and assessed her around 2:00 p.m., defendant repeatedly denied having been pregnant and having given birth. Garcia and Rocha both knew these statements to be false, and Rocha informed authorities that there was a missing baby. Search efforts to find Baby Farias began, but there is no indication that defendant ever admitted to anyone on June 19 that she had given birth. There is also no evidence that defendant attempted to help searchers in any way or that she gave any indication of where Baby Farias might be. This is abnormal behavior for a woman who has recently given birth. Moreover, Baby Farias was found hidden in bushes and wrapped in clothing, which clearly indicated that it was not intended for Baby Farias to be found. Baby Farias's DNA and defendant's DNA were found on the clothes Baby Farias was discovered wrapped in, which linked him to defendant. Considering defendant's pregnancy and birthing denials, her failure to do anything to locate Baby Farias, the DNA on the clothing, and the manner and location in which Baby Farias's body was hidden (in bushes not far from the Rural Health Center), as well as the ill will defendant reportedly

11.

harbored toward Baby Farias (as discussed above), the jury could have reasonably concluded that defendant had killed Baby Farias and did not want his body to be found.

In terms of deliberation and premeditation and the *Anderson* factors, we disagree with the People that there is substantial evidence of planning. While the People correctly note that Baby Farias was wrapped in a bundle of clothes and hidden out of view, those events occurred *after* the death of Baby Farias. We cannot say that merely hiding Baby Farias's dead body sufficiently demonstrates planning *before* the murder. Nevertheless, as discussed above, there is evidence of motive. Moreover, there is also significant probative evidence regarding the method of killing.

The testimony of Whitmore was striking. Whitmore vividly described the injuries sustained by Baby Farias and how those injuries could have been sustained. Bruising and lacerations to the mouth, tongue, and soft palate indicated that fingers were jammed into Baby Farias's mouth. Petechiae in the eyes and abrasions about the neck indicated attempted suffocation. Abrasions and bruising to the back and chest, as well as numerous broken ribs, indicated being squeezed or hit. Finally, significant abrasions to the head and catastrophic skull and brain injuries indicated extreme force was used to beat Baby Farias, either through swinging or hitting. Considering this testimony, as well as the bruising to Baby Farias's lower legs, evidence that he had been born alive, and Stokes's testimony that she saw blood on the side of the clinic, a very determined course of conduct can easily be inferred. That is, the unwanted Baby Farias was born alive, healthy, and crying. Defendant then decided to attempt to stop the air supply to Baby Farias through three separate acts: jamming fingers into his mouth, squeezing his neck, and squeezing and hitting his chest. When that failed, defendant continued the assault, either through a series of heavy blows to the head or holding onto Baby Farias's legs and swinging him into the side of the clinic (which would explain the abrasions, severe head and brain trauma, and blood on the side of the clinic), or both. Eventually, the head trauma killed Baby Farias. At any point during this sequence of actions,

defendant could have stopped. However, she continued to inflict different forms of physical trauma on Baby Farias until he was dead. Quite simply, the nature of the wounds suffered, as well as the actual cause of death of severe head trauma, demonstrate that a determined and escalating course of conduct was taken in order to end Baby Farias's life. This method of killing is sufficient to demonstrate premeditation and an intent to kill, i.e., malice. (Cf. *People v. Elliot* (2005) 37 Cal.4th 453, 471 [holding that the method of killing, which included three fatal knife wounds, approximately 80 knife cuts and slashes, and four bullet wounds, was sufficient to support the conclusion that the killing was premeditated and calculated].)

We recognize that there is no direct evidence that defendant killed Baby Farias. We further recognize that other reasonable inferences may be made from the evidence presented. However, the test for sufficiency of the evidence is not whether the evidence points to only one reasonable conclusion or only one reasonable inference. (See *People v. Wilson*, *supra*, 11 Cal.5th at p. 302; *People v. Westerfield*, *supra*, 6 Cal.5th at p. 713.) The evidence presented allowed the jury to reasonably infer that defendant had ill will toward Baby Farias and wanted to harm him, that she killed and intended to kill Baby Farias, and that she did so willfully, deliberately, and with premeditation by beating Baby Farias to death. (*Westerfield*, at p. 713.) We presume that the jury reasonably deduced and inferred these facts in reaching their verdict. (*People v. Ware*, *supra*, 14 Cal.5th at 167–168.) Therefore, we conclude that the evidence presented was "reasonable, credible, and of solid value" such that a reasonable jury could have found the defendant guilty of first degree murder beyond a reasonable doubt.[5] (*Ibid*.; see also *Morales*, *supra*, 10 Cal.5th at p. 88.)

---

[5] Although defendant challenges the sufficiency of the evidence with respect to both the murder and child assault convictions, defendant makes no arguments that specifically address the child assault conviction. We take defendant's position to be that her arguments apply equally to both offenses. Therefore, for the same reasons that the

## DISPOSITION

The judgment is affirmed.

---

evidence is sufficient to support the murder conviction, we conclude that the evidence is sufficient to support the child assault conviction.